**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1636**

FRANKLIN SAVAGE,

     Plaintiff – Appellee,

  and

KEVIN SEWELL; LYNELL GREEN,

     Plaintiffs,

  and

UNITED STATES OF AMERICA,

     Intervenor/Plaintiff,

  v.

STATE OF MARYLAND,

     Defendant – Appellant,

  and

POCOMOKE CITY; POCOMOKE CITY POLICE DEPARTMENT; WORCESTER COUNTY SHERIFF'S OFFICE; DEPARTMENT OF MARYLAND STATE POLICE; RUSSELL BLAKE, in his individual capacity only; ERNIE CROFOOT, individually, and in his official capacity as Pocomoke City Manager; BRUCE MORRISON, individually, and in his official capacity as Pocomoke City Mayor; BEAU OGLESBY, in his individual capacity as the Worcester County State's Attorney; NATHANIEL PASSWATERS, in his individual capacity only; BROOKS PHILLIPS, individually, and in his official capacity as a Department of Maryland State Police Corporal; DALE SMACK, in his individual capacity only; DALE TROTTER; RODNEY WELLS, in his

individual capacity only; PATRICIA DONALDSON, individually, and in her official capacity as a Department of Maryland State Police Sergeant; COUNTY COMMISSIONERS OF WORCESTER COUNTY; REGGIE T. MASON, in his official capacity as Worcester County Sheriff,

> Defendants.

------------------------------------

HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC; PUBLIC JUSTICE CENTER,

> Amicus Supporting Appellee.

---

**No. 17-1779**

---

FRANKLIN SAVAGE,

> Plaintiff – Appellant,

and

KEVIN SEWELL; LYNELL GREEN,

> Plaintiffs,

and

UNITED STATES OF AMERICA,

> Intervenor/Plaintiff,

> v.

BEAU OGLESBY, in his individual capacity as the Worcester County State's Attorney,

> Defendant – Appellee,

and

2

POCOMOKE CITY; POCOMOKE CITY POLICE DEPARTMENT; WORCESTER COUNTY SHERIFF'S OFFICE; DEPARTMENT OF MARYLAND STATE POLICE; RUSSELL BLAKE, in his individual capacity only; ERNIE CROFOOT, individually, and in his official capacity as Pocomoke City Manager; BRUCE MORRISON, individually, and in his official capacity as Pocomoke City Mayor; NATHANIEL PASSWATERS, in his individual capacity only; BROOKS PHILLIPS, individually, and in his official capacity as a Department of Maryland State Police Corporal; DALE SMACK, in his individual capacity only; DALE TROTTER; RODNEY WELLS, in his individual capacity only; PATRICIA DONALDSON, individually, and in her official capacity as a Department of Maryland State Police Sergeant; COUNTY COMMISSIONERS OF WORCESTER COUNTY; REGGIE T. MASON, in his official capacity as Worcester County Sheriff; STATE OF MARYLAND,

                    Defendants.

------------------------------

HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC; PUBLIC JUSTICE CENTER,

                    Amici Supporting Appellant.

                    **No. 17-1989**

FRANKLIN SAVAGE,

                    Plaintiff – Appellee,

        and

KEVIN SEWELL; LYNELL GREEN,

                    Plaintiffs,

        and

UNITED STATES OF AMERICA,

                    Intervenor/Plaintiff,

3

v.

STATE OF MARYLAND,

Defendant – Appellant,

and

POCOMOKE CITY; POCOMOKE CITY POLICE DEPARTMENT; WORCESTER COUNTY SHERIFF'S OFFICE; DEPARTMENT OF MARYLAND STATE POLICE; RUSSELL BLAKE, in his individual capacity only; ERNIE CROFOOT, individually, and in his official capacity as Pocomoke City Manager; BRUCE MORRISON, individually, and in his official capacity as Pocomoke City Mayor; BEAU OGLESBY, in his individual capacity as the Worcester County State's Attorney; NATHANIEL PASSWATERS, in his individual capacity only; BROOKS PHILLIPS, individually, and in his official capacity as a Department of Maryland State Police Corporal; DALE SMACK, in his individual capacity only; DALE TROTTER; RODNEY WELLS, in his individual capacity only; PATRICIA DONALDSON, individually, and in her official capacity as a Department of Maryland State Police Sergeant; COUNTY COMMISSIONERS OF WORCESTER COUNTY; REGGIE T. MASON, in his official capacity as Worcester County Sheriff,

Defendants.

----------------------------

HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC; PUBLIC JUSTICE CENTER,

Amici Supporting Appellee.

_____

Appeals from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Senior District Judge. (1:16-cv-00201-JFM)

_____

Argued: March 20, 2018                                    Decided: July 13, 2018

_____

Before WYNN, FLOYD, and HARRIS, Circuit Judges.

_____

4

Affirmed in part, reversed in part, and remanded by published opinion. Judge Harris wrote the opinion, in which Judge Wynn and Judge Floyd joined.

———————————

**ARGUED:** Jennifer L. Katz, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellant/Cross-Appellee. Dennis A. Corkery, WASHINGTON LAWYERS COMMITTEE FOR CIVIL RIGHTS & URBAN AFFAIRS, Washington, D.C., for Appellee/Cross-Appellant. **ON BRIEF:** Brian E. Frosh, Attorney General, Karen L. Federman Henry, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellant/Cross-Appellee. Matthew Handley, WASHINGTON LAWYERS COMMITTEE FOR CIVIL RIGHTS & URBAN AFFAIRS, Washington, D.C.; Deborah A. Jeon, Sonia Kumar, ACLU OF MARYLAND, Baltimore, Maryland; Theodore A. Howard, Brian G. Walsh, Craig Smith, Kendra P. Norwood, WILEY REIN LLP, Washington, D.C., for Appellee/Cross-Appellant. Ajmel Quereshi, HOWARD UNIVERSITY SCHOOL OF LAW, Washington, D.C.; Debra Gardner, PUBLIC JUSTICE CENTER, Baltimore, Maryland, for Amici Curiae.

———————————

PAMELA HARRIS, Circuit Judge:

These appeals are part of broader litigation alleging pervasive race discrimination and unlawful retaliation against three African-American police officers who worked for Pocomoke City in Worcester County, Maryland. The issues before us today arise from the interactions of one of those plaintiffs, Franklin Savage, with the State's Attorney for Worcester County, Beau Oglesby. According to Savage, Oglesby created a hostile work environment by reading aloud, at a trial preparation meeting, potential evidence in the form of letters containing racial epithets. And then, Savage alleges, after he complained of the incident, Oglesby retaliated against him by refusing to call him as a witness in criminal cases and notifying Pocomoke City officials of that decision.

On the basis of these allegations, Savage sued State's Attorney Oglesby for violations of his civil rights. He also sued the State of Maryland under Title VII, asserting that Maryland, as Oglesby's employer, is vicariously liable for his unlawful acts. The district court dismissed the claims against Oglesby, holding that he is protected by absolute prosecutorial immunity, but allowed the claims against Maryland to proceed.

We agree with the district court that prosecutorial immunity bars Savage's claims against Oglesby. Reviewing and evaluating evidence in preparation for trial, making judgments about witness credibility, and deciding which witnesses to call and which cases may be prosecuted all are directly connected to the judicial phase of the criminal process, protected by absolute immunity. We disagree, however, with respect to Savage's retaliation claim against Maryland. Because no reasonable employee could believe that Oglesby violated Title VII at the trial-preparation meeting to which Savage

6

objected, Savage's allegations fail to state a claim under Title VII, and should be dismissed for that reason.

## I.

## A.

Franklin Savage alleges that he was subjected to unlawful discrimination and retaliation while he was employed by the Pocomoke City Police Department and on detail to the Worcester County Criminal Enforcement Team ("CET"), a multi-jurisdictional drug interdiction task force led by the Worcester County Sheriff's Office. He and two co-plaintiffs, all African Americans and former Pocomoke City police officers, filed a suit against multiple state and local agencies and their employees, alleging widespread race-based employment discrimination and retaliation. The interlocutory cross-appeals before us today address just one discrete part of this broader litigation, and are limited to Savage's allegations against State's Attorney Oglesby and the State of Maryland as Oglesby's employer.

Savage joined the Pocomoke City Police Department in 2011, and in 2012 was assigned to the CET. In April 2014, Savage attended a meeting with members of the Worcester County State's Attorney's office, including State's Attorney Oglesby. The purpose of the meeting, according to Savage, was to "discuss an upcoming case" on which he had been the arresting officer. J.A. 109. During the meeting, Savage alleges, he "presented some documents" – letters written by the suspects – "that were going to be looked at by the State's Attorney's Office to decide if they were going to use them in the

7

upcoming court case." *Id.* Then, Savage claims, Oglesby "began to read the letters verbatim line for line," which meant "us[ing] the word Nigga over and over again." *Id.* When Oglesby stopped and asked whether he was "offending anybody by reading these letters," Assistant State's Attorney Ajene Turnbull, the only other African American present, left the room. *Id.* Savage remained, and Oglesby continued reading. After some discussion, Oglesby asked for "copies of the letters so that he could use them for trial." *Id.*

In July 2014, after Savage had resigned from the CET and returned to the Pocomoke City Police Department, he filed two written complaints, one with the Equal Employment Opportunity Commission and one with the Maryland Attorney Grievance Commission. Both objected to Oglesby's repeated reading of the racial slur during the April 2014 meeting. In his complaints, Savage described the word "Nigga" as "highly powerful and hurtful," and expressed his deep offense that Oglesby would "use the word Nigga so freely and without care in front of ASA Turnbull and me." J.A. 109. Since the meeting, Savage said, he was "having problems with [his] cases being prosecuted" and also "problems sleeping." *Id.*

In September 2014, Oglesby sent a letter to the Pocomoke City Mayor and City Council, "implying that he would not allow Officer Savage to testify in court" because of concerns about his "veracity." J.A. 54. And indeed, Oglesby's letter directly stated that

8

the "recent conduct of . . . Savage calls into question his veracity." J.A. 187.[1] Citing his legal obligation to disclose material that could be used to impeach state witnesses, Oglesby went on to conclude that he would be required to "evaluate any case" in which Savage would be a witness "to determine what impact he w[ould] have on our ability to prosecute." *Id.* The bottom line appeared to be that Oglesby would not call Savage as a witness without corroboration for his testimony, and would instead decline to prosecute in such cases: "If we are unable to independently corroborate his testimony and therefore must rely solely on his word, the likely outcome will be a dismissal of the case." *Id.* According to Savage, because testifying in court was a "vital part" of his duties, that decision "directly interfered" with his ability to do his job. J.A. 69.

Over a year later, in October 2015, Oglesby and the Pocomoke City Manager had a telephone conversation. Savage's complaint describes it as follows: "Oglesby was adamant that Officer Savage would never be able to testify again and was thus useless to the Pocomoke City Police Department. On information and belief, Oglesby reiterated that Officer Savage should be terminated." J.A. 59. Savage was fired from his position with the Pocomoke City Police Department ten days later.

---

[1] We quote here from the full text of Oglesby's September 2014 letter, which, though not an exhibit to Savage's complaint, was attached by Oglesby to his responsive motion. Because Savage's complaint refers to (and indeed quotes) the letter, we may consider it in deciding whether Savage has stated a claim. *See Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).

**B.**

Savage, along with his co-plaintiffs, filed suit against multiple defendants in federal court, seeking damages and attorney's fees as well as declaratory and injunctive relief. Savage sued Oglesby in his personal capacity, alleging violations of his civil rights under 42 U.S.C. §§ 1981, 1983, and 1985. Specifically, Savage claimed that Oglesby created a racially hostile work environment at the April 2014 trial-preparation meeting when he read aloud potential evidence containing numerous references to a racial epithet. Oglesby then violated the First Amendment, Savage claimed, by retaliating against him when he spoke out about the meeting, a matter of public concern. According to Savage's complaint, that retaliation took the form of Oglesby's decision to prohibit Savage from testifying and his letter to Pocomoke City (or "City") officials communicating that decision and impugning his veracity. As a result of those actions, Savage alleged, he was unable to perform critical job duties.[2]

Oglesby moved to dismiss the claims against him or, in the alternative, for summary judgment. The district court granted Oglesby's motion. Without elaborating further, it held that Savage's claims against Oglesby "are barred by the doctrine of absolute prosecutorial immunity." J.A. 206.

---

[2] Savage also alleged that Oglesby participated in a civil conspiracy interfering with his civil rights. To the extent that claim incorporates any allegations separate and apart from Savage's allegations of hostile work environment and retaliation, it is not separately argued in Savage's appeal, and we need not address it further here. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (declining to address claim abandoned on appeal).

In response, Savage amended his complaint to add Title VII claims against the State of Maryland, based on the same factual predicate as his claims against Oglesby. As Oglesby's employer, Savage alleged, the State was liable for Oglesby's unlawful acts. Savage acknowledged that Pocomoke City, and not the State of Maryland, "constitutes [his] employer for purposes of Title VII." J.A. 268. But his retaliation claim against the State could go forward, he claimed, under a third-party interference theory: The State, though not his employer, unlawfully interfered with his employment relationship with Pocomoke City when Oglesby retaliated against him for complaining about race discrimination.

The State moved to dismiss or, in the alternative, for summary judgment with respect to this retaliatory interference claim. According to the State, Oglesby's absolute immunity should extend to the State in an action based entirely on the same conduct for which Oglesby was immune. And in any event, the State argued, Savage could not state a claim under Title VII's anti-retaliation provision, which permits suits only against a plaintiff's employer – here, Pocomoke City – and not against third parties like the State. The district court denied the State's motion without discussion.

So that he could seek immediate appeal of Oglesby's dismissal from the case, Savage sought and was granted partial final judgment as to Oglesby. The State, too, wanted an immediate appeal, and the district court obliged by certifying for interlocutory appeal its order denying the State's motion to dismiss or for summary judgment. This court granted the State permission to appeal, and we now have before us timely filed interlocutory appeals by both Savage and the State.

11

## II.

We begin with the district court order dismissing Oglesby from the case based on absolute prosecutorial immunity. We review that order de novo, accepting all of Savage's factual allegations as true and drawing all reasonable inferences in his favor. *Singer v. Reali*, 883 F.3d 425, 437 (4th Cir. 2018).[3]

## A.

In *Imbler v. Pachtman*, 424 U.S. 409, 430–32 (1976), the Supreme Court held that prosecutors are absolutely immune from damages liability when they act as advocates for the State. That decision rests on an "important public policy" justification. *Carter v. Burch*, 34 F.3d 257, 261 (4th Cir. 1994). "The 'public trust of the prosecutor's office would suffer' were the prosecutor to have in mind his 'own potential' damages 'liability' when making prosecutorial decisions – as he might well were he subject to § 1983 liability." *Van de Kamp v. Goldstein*, 555 U.S. 335, 341–42 (2009) (quoting *Imbler*, 424 U.S. at 424). The Supreme Court recognized that this immunity would leave the

---

[3] In granting Oglesby's motion to dismiss or, in the alternative, for summary judgment, the district court did not specify whether it was granting the motion on the pleadings or in light of evidence attached to Oglesby's motion and reply. But because Savage had filed an affidavit identifying additional discovery that would be necessary before deciding whether summary judgment was warranted, a grant of summary judgment might have been improper. *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). Accordingly, we proceed under the standard governing motions to dismiss. *Cf. Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 976 (D.C. Cir. 2016) ("Because this case arises from the district court's grant of a motion to dismiss and, in the alternative, summary judgment, we take the factual allegations contained in the complaint as true and draw all reasonable inferences in the [plaintiff's] favor.").

"genuinely wronged" without a remedy against prosecutors acting for malicious or unlawful purposes. *Imbler*, 424 U.S. at 427. But the importance of shielding prosecutorial decision-making from the influence of personal liability concerns, the Court concluded, outweighed that harm. *See Carter*, 34 F.3d at 261 (describing *Imbler*'s reasoning).

Given these costs, however, the Court has been careful to limit the scope of a prosecutor's absolute immunity. Because prosecutorial immunity "safeguards the process, not the person," it applies only to conduct that is "'intimately associated with the judicial phase of the criminal process.'" *Nero v. Mosby*, 890 F.3d 106, 117–18 (4th Cir. 2018) (quoting *Imbler*, 424 U.S. at 430–31). In deciding whether an action meets that standard, we apply a "functional approach," looking to "'the nature of the function performed,' without regard to 'the identity of the actor who performed it.'" *Id.* at 118 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). And we focus on the "conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful." *Buckley*, 509 U.S. at 271.

When a prosecutor is functioning as an advocate for the State, it is clear that his or her actions are "intimately associated with the judicial phase of the criminal process" and thus protected by absolute immunity. *See Imbler*, 424 U.S. at 430–31. The Court has distinguished those advocacy functions from administrative or investigative functions that a prosecutor also may perform, and to which absolute immunity may not extend. *See Van de Kamp*, 555 U.S. at 342 ("The Court made clear that absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court' but is instead engaged in

13

other tasks, say, investigative or administrative tasks." (quoting *Imbler*, 424 U.S. at 431 n.33)); *Nero*, 890 F.3d at 118 (same). The burden is on the prosecutor claiming immunity to show that the acts in question are "directly connected" with the judicial process, *Van de Kamp*, 555 U.S. at 344, justifying the protections of absolute immunity. *See Nero*, 890 F.3d at 118.

**B.**

We apply these principles, first, to Savage's allegation that Oglesby unlawfully created a hostile work environment during the April 2014 trial-preparation meeting. According to Savage, Oglesby violated his civil rights when he gratuitously read aloud potential trial evidence, in the form of letters from suspects, using the word "Nigga." We conclude that Oglesby was acting within his role as advocate during the trial-preparation meeting, entitling him to absolute immunity from damages liability on Savage's claim.

The Supreme Court has made clear that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Buckley*, 509 U.S. at 272 (quoting *Imbler*, 424 U.S. at 431 n.33). So even if, as Savage alleges, the April 2014 meeting "was held prior to any charges being filed against the potential defendants who wrote or were referenced in the letters read by Oglesby," J.A. 48–49, that would not bring it outside the scope of Oglesby's advocacy role. Instead, the Supreme Court expressly defines that role to encompass "acts undertaken by a prosecutor in *preparing for* the initiation of judicial proceedings or for trial," *Buckley*, 509 U.S. at 273 (emphasis added) – including, specifically, the "professional evaluation of the evidence assembled by the police and

14

appropriate preparation for its presentation at trial," if and when a case is prosecuted. *Id.*; *Imbler*, 424 U.S. at 431 n.33 ("Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.").

Given this settled understanding, it is clear that Oglesby was functioning as an advocate for the State when he engaged in the conduct alleged by Savage. On Savage's own account, the purpose of the April 2014 meeting was "preparing for . . . trial," *see Buckley*, 509 U.S. at 273: Savage met with prosecutors from the State's Attorney's office in order "to discuss an upcoming case" on which he was the arresting officer. J.A. 109. And then (still according to Savage), Savage himself gave Oglesby the letters so that the prosecutors could "decide if they were going to use them in the upcoming court case," *id.* – precisely the "professional evaluation of the evidence assembled by the police" contemplated by *Buckley*. *See* 509 U.S. at 273. Finally, after "read[ing] the letters verbatim line for line," Oglesby asked for "copies of the letters *so that he could use them for trial*." J.A. 109 (emphasis added). What Savage is describing, in his own words, is a paradigmatic example of a prosecutor's evaluation of evidence in preparation for trial, squarely within the zone of prosecutorial immunity.

Savage's contrary argument rests on his allegation that it was "unnecessary" for Oglesby to read aloud and verbatim the letters he provided in order to assess their potential as trial evidence. J.A. 48. But how evidence should be evaluated is exactly the kind of professional judgment call that prosecutorial immunity is designed to protect. *See Van de Kamp*, 555 U.S. at 344 (describing the "exercise of [legal] discretion" protected by prosecutorial immunity). There is no claim in this case that Oglesby used the occasion

15

of a trial-preparation meeting to make statements or engage in conduct divorced from the subject of the meeting; rather, Savage objects to the manner in which Oglesby reviewed potential evidence presented by Savage himself and concededly "connected" to the case at hand. Resp. Br. & Opening Br. of Appellee/Cross-Appellant Savage ("Savage Opening Brief") at 6. And while we take as a given that Savage, as he alleges, was deeply offended by Oglesby's actions, the immunity analysis does not turn on "the harm that the [prosecutor's] conduct may have caused," but rather on the function the prosecutor was performing at the time. *Buckley*, 509 U.S. at 271. Because Oglesby was acting in his role as advocate, reviewing potential evidence for use at trial, he is protected by prosecutorial immunity.

## C.

We turn next to Savage's allegation that Oglesby violated his First Amendment rights by retaliating against him for speaking out after the April 2014 meeting. According to Savage, after Oglesby learned of his complaint to the Maryland Attorney Grievance Commission, he "prohibited [him] from testifying on any case [he] investigated" in "direct retaliation," and falsely accused Savage of dishonesty in the letter he sent to City officials announcing that decision. J.A. 69. As a result, Savage alleges, he was unable to "execute his job duties." *Id.* Again, we find that the actions Savage describes were "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430, entitling Oglesby to absolute immunity from damages liability.

16

**1.**

Decisions regarding witness testimony – which witnesses to call, whether potential witnesses are credible, and how to proceed in the face of credibility questions – are a core prosecutorial function, directly tied to the conduct of a criminal trial. This is clear from *Imbler* itself, holding that prosecutors are absolutely immune from claims that they knowingly presented false testimony at trial: Because "[t]he veracity of witnesses in criminal cases frequently is subject to doubt," the Court explained, the integrity of the criminal process would suffer if "prosecutors were hampered in exercising their judgment as to the use of such witnesses by concern about resulting personal liability." *Imbler*, 424 U.S. at 426. Instead, decisions about "which witnesses to call" are among the "sensitive issues" that prosecutors must address in their capacity as advocates as they prepare for trial, fully shielded by immunity. *Id.* at 430 n.33.

That is especially so when, as here, assessments of witness credibility are tightly intertwined with determinations about which cases to charge. The alleged decision to which Savage objects is not only that Savage would not be called as a witness; it is also that Oglesby would dismiss instead of prosecuting cases in which Savage's account could not be corroborated. *See* J.A. 187 ("If we are unable to independently corroborate [Savage's] testimony and therefore must rely solely on his word, the likely outcome will be a dismissal of the case."). And whether to "initiat[e] a prosecution," of course, is in the heartland of the prosecutorial discretion covered by absolute immunity. *See Burns v. Reed*, 500 U.S. 478, 486 (1991) (quoting *Imbler*, 424 U.S. at 431).

17

Applying these principles, the Ninth Circuit held in *Roe v. City and County of San Francisco*, 109 F.3d 578 (1997), that a prosecutor is absolutely immune from a claim that he unlawfully retaliated against a police officer by prohibiting him from testifying and refusing to prosecute cases in which his account could not be verified. The facts in *Roe* are strikingly similar to those here: A police officer alleged that after he circulated a legal memorandum criticizing prosecutorial conduct, the prosecutor stopped calling him as a witness, determined that there would be no prosecutions of the officer's cases without corroborating evidence, and communicated that decision to the officer's state employer – all of which led to the officer being reassigned because he no longer could "complete [his] duties." *Id.* at 580–82. The officer sued, raising the same claim as Savage – retaliation for speaking out, in violation of the First Amendment. But that claim, the Ninth Circuit concluded, was barred by absolute prosecutorial immunity. The prosecutor's failure to prosecute the officer's cases, the court reasoned, was fully protected: "There can be no question that the nature of the decision not to prosecute is 'intimately associated with the judicial phase of the criminal process.'" *Id.* at 583 (quoting *Burns*, 500 U.S. at 486). So, too, for the prosecutor's assessment of the officer's credibility, whether "accurate or not." *Id.* at 584. "Just as a prosecutor's professional evaluation of the evidence assembled by the police is entitled to absolute immunity, a prosecutor's professional evaluation of a witness is entitled to absolute immunity even if that judgment is harsh, unfair or clouded by personal animus, as [the officer] alleges here." *See id.* (internal citation omitted).

18

We agree with *Roe*, and with the other cases reaching the same conclusion. *See, e.g.*, *Harrington v. Almy*, 977 F.2d 37, 42 (1st Cir. 1992) (absolute immunity applies to prosecutor's decision not to charge cases initiated by particular officer); *Barnett v. Marquis*, 16 F. Supp. 3d 1218, 1222–23 (D. Or. 2014), *aff'd*, 662 F. App'x 537 (9th Cir. 2016) (absolute immunity applies to prosecutor's decision not to use police officer as witness based on credibility concerns); *Neri v. Cty. of Stanislaus Dist. Attorney's Office*, No. 1:10-CV-823-AWI-GSA, 2010 WL 3582575, at *8 (E.D. Cal. Sept. 9, 2010) (absolute immunity applies to prosecutor's decision to "*Brady*-list" officer, i.e., refuse to use him as trial witness based on credibility concerns). In each of these cases, the prosecutor's decision, conveyed to the officer's employer, meant that the officer no longer could perform the basic functions of the job, leading to predictably negative employment repercussions. *Harrington*, 977 F.2d at 38–39; *Barnett*, 16 F. Supp. 3d at 1221; *Neri*, 2010 WL 3582575, at *2. And in each, the officer alleged that the prosecutor's decision in fact was driven by retaliatory or malicious motives. But whether or not that was so, the courts concluded, was "immaterial" to the immunity analysis. *See Barnett*, 662 F. App'x at 539. What mattered is that the prosecutors' actions involved assessments of witness credibility and judgments about which cases to prosecute, directly connected to the judicial phase of the criminal process and thus protected by absolute immunity. *See Harrington*, 977 F.2d at 40–41; *Neri*, 2010 WL 3582575, at *5.

That result is consistent with – indeed, compelled by – the long line of cases holding prosecutors absolutely immune from claims that they have failed to meet their obligations to disclose exculpatory evidence, *see Brady v. Maryland*, 373 U.S. 83 (1963),

19

or material affecting the credibility of a state witness, *see Giglio v. United States*, 405 U.S. 150 (1972). Because assessments of evidence and witness credibility "require legal knowledge and the exercise of related discretion" that is "directly connected with the conduct of a trial," prosecutors enjoy absolute immunity from claims that they should have identified witness credibility issues and then shared that information with defendants, *Van de Kamp*, 555 U.S. at 343–44 (failure to disclose *Giglio* impeachment material protected by prosecutorial immunity), or that they should have identified evidence as exculpatory and then provided it to the defense, *Imbler*, 424 U.S. at 431 n.34; *see also Neri*, 2010 WL 3582575, at *6 (listing court of appeals cases). The same rule must apply when, as here, a prosecutor cites an effort to *comply* with his disclosure obligations in making an adverse credibility determination about a state witness and declining to put that witness on the stand or to prosecute cases that turn on his testimony. *See* J.A. 187 (Oglesby's letter to City officials). Otherwise, we would be left with a lopsided immunity that provides full protection when a prosecutor ignores credibility concerns regarding a state witness, but withholds protection when he does not. That kind of "asymmetrical" prosecutorial immunity would be worse than none at all, creating the risk that prosecutors' decision-making could be skewed systematically in one direction – *against* taking steps to address credibility concerns – by fear of damages liability. *See Harrington*, 977 F.2d at 41 ("The asymmetrical availability of immunity . . . should not be a factor which induces a prosecutor to choose to initiate questionable prosecutions relying upon witnesses the prosecution does not believe credible in order to avoid liability for declining to prosecute."); *cf. Neri*, 2010 WL 3582575, at *6 (immunity must

20

protect equally prosecutorial decisions to disclose and to withhold potential *Brady* material).

Savage argues, in effect, that this is the wrong lens through which to see his case. His case, he urges, is not about "the judicial phase of the criminal process," *see Imbler*, 424 U.S. at 430, but about employment: By refusing to call him as a witness or to prosecute his cases, and then describing that decision to City officials as resting on veracity concerns, Oglesby effectively made it impossible for him to do his job. And absolute immunity is not available to prosecutors when they make employment decisions, Savage contends, because those are "administrative" rather than advocacy functions. *See Van de Kamp*, 555 U.S. at 342 ("[A]bsolute immunity may not apply when a prosecutor is not acting as 'an officer of the court' but is instead engaged in other tasks, say, investigative or administrative tasks."); *Forrester v. White*, 484 U.S. 219, 229–30 (1988) (holding that absolute immunity does not shield judges' employment decisions and noting that "no one suggests" a prosecutor's decision to fire an assistant attorney would be entitled to absolute immunity).

We cannot agree. That a judgment about witness credibility or which cases to try has negative employment consequences – even readily foreseeable ones – does not change the underlying nature of that judgment; the immunity analysis focuses on the prosecutorial conduct in question, and "not on the harm that the conduct may have caused." *Buckley*, 509 U.S. at 271. Nor does the effect on Savage's career do anything to distinguish this case from all the others, discussed above, in which courts apply absolute immunity when police officers lose their jobs or suffer other adverse actions

21

because their employers are informed by prosecutors that they no longer will be used as witnesses. *See, e.g.*, *Roe*, 109 F.3d at 582; *Barnett*, 16 F. Supp. 3d at 1221, 1223.

Most important, the Supreme Court has clarified that even if all or some of the conduct complained of by Savage could be categorized as employment-related and hence "administrative," it still would be protected by absolute immunity. In *Van de Kamp*, the Court considered whether prosecutors could be sued for non-disclosure of *Giglio* impeachment material that allegedly resulted from their failure to train and supervise attorneys properly or to collect potential impeachment material about informants. 555 U.S. at 338–39. The Court recognized that the functions in which the defendant-prosecutors were engaged – training, supervision, and information-systems management – were "administrative" in nature. *Id.* at 343–44. But because they also were "directly connected with the conduct of a trial" and required the exercise of legal discretion, the Court concluded, *id.* at 344, they remained protected by absolute immunity: "The management tasks at issue . . . concern how and when to make impeachment information available at a trial. They are thereby directly connected with the prosecutor's basic trial advocacy duties." *Id.* at 346. The same "direct connection" to the trial process and the prosecutor's role as advocate is present here. Even if we were to categorize Oglesby's alleged actions – in particular, his communications with City officials about Savage's status – as "administrative" or "managerial," they would remain inextricably linked with the underlying assessment of Savage's credibility and discretionary judgment about how best to respond. *See Neri*, 2010 WL 3582575, at *7 (assuming act of putting officer's

22

name on "Brady List" of officers who will not be called to testify is "administrative," but holding that absolute immunity applies under *Van de Kamp*).

It remains the general rule, of course, that prosecutors will not be entitled to absolute immunity when acting in their administrative capacities as employers. *See Van de Kamp*, 555 U.S. at 344 (suggesting that "unlawful discrimination in hiring employees" is administrative task outside the scope of absolute immunity). It is only "a certain kind of administrative obligation – a kind that itself is directly connected with the conduct of a trial," like Oglesby's communications with the City regarding his assessment of Savage as a potential trial witness – that calls for the protections of absolute immunity. *See id.* And we agree with Savage that not *every* action a prosecutor might take against a police officer who has been barred from testifying will be covered by absolute immunity. Even in that context, if a prosecutor's alleged conduct cannot be connected to discretionary judgments about which witnesses to call and which cases to prosecute, then absolute immunity will not apply. For instance, insisting that a former investigator, even after he has found new employment, be barred from working on any stage of an investigation, regardless of whether he will be a potential witness or his testimony is corroborated, may lack the requisite connection to the judicial process to bring it within the ambit of absolute immunity. *See Botello v. Gammick*, 413 F.3d 971, 977–78 (9th Cir. 2005) (holding that absolute immunity does not extend to "dictating to [new employer] how future criminal investigations should be conducted and staffed"); *see also Mikko v. City of Atlanta*, 857 F.3d 1136, 1143 (11th Cir. 2017) (holding that absolute immunity does not extend to prosecutor's efforts to "prevent a witness from testifying in a case handled

23

by a different prosecutor, from a different office, in a different jurisdiction"). But when, as here, the alleged prosecutorial conduct involves the decision not to call an officer as a witness and communication of that decision to the relevant employer, it is "intimately tied to the judicial process" and thus entitled to absolute immunity. *Botello*, 413 F.3d at 977 (holding that absolute immunity does extend to prosecutors' decision not to prosecute cases brought by former police investigator and communication of that decision to new employer).

**2.**

In pressing his contrary arguments, Savage does not differentiate Oglesby's September 2014 letter to City officeholders from his alleged October 2015 phone conversation with the City Manager, instead treating them together as "*ultra vires* statements to Pocomoke City officials" that are not entitled to prosecutorial immunity. Savage Opening Brief at 20. For the reasons given above, we disagree. And to the extent Savage can be understood to argue that his case should proceed because the phone conversation, in particular, lacks the required connection to the criminal trial process, we again must disagree.

Critically, Savage's own complaint does not identify the phone conversation – more specifically, the part of the conversation in which Oglesby purportedly recommended that Savage be terminated – as having any independent significance, apart from Oglesby's protected conduct in prohibiting Savage's testimony and explaining that decision to City officials. Count IV of the complaint, for First Amendment retaliation, identifies two and only two actions taken by Oglesby in alleged retaliation for Savage's

24

public statements about the April 2014 trial-preparation meeting: Oglesby "prohibited . . . Savage from testifying," and Oglesby sent City officials a September 2014 letter announcing that decision and "falsely accusing . . . Savage of lying." J.A. 69. It was those two actions, Savage alleges, that effectively made it impossible for him to fulfill his job functions, because "[t]estifying at trial in criminal prosecutions was a vital part of [his] duties as a police officer." *Id.* Nowhere does Savage allege that the phone conversation of a year later (described in his factual allegations and incorporated into each count of the complaint) was a separate act of retaliation, also caused by his objections to the meeting. Nor does he allege that Oglesby's purported employment recommendation during that conversation – as opposed to Oglesby's continued refusal to allow his testimony, which already, on his own telling, had rendered him unable to perform his job duties and relegated to purely administrative tasks, J.A. 60 – played any independent causal role in his termination. Accordingly, Savage's allegations regarding the purported retaliatory nature of the September 2014 letter and the October 2015 phone conversation rely on the same shielded conduct discussed above, and therefore fail to state a plausible claim for retaliation.

**D.**

Finally, Savage argues that even if Oglesby is entitled to absolute prosecutorial immunity, the district court erred in dismissing Oglesby from the case entirely. Prosecutorial immunity is an immunity from damages liability only. *See Imbler*, 424 U.S. at 431. Thus, Savage contends, the district court should have allowed claims for declaratory and injunctive relief against Oglesby to proceed. We disagree.

25

Oglesby, unlike other defendants in this case, was sued only in his personal capacity, not his official capacity, and it is clear from the complaint that the only relief sought against him is money damages arising from past conduct. Savage has not alleged that he faces a "real and immediate threat of future injury" from Oglesby, as would be required for entry of prospective injunctive or declaratory relief under § 1983; continuing "emotional consequences" from Oglesby's prior acts are not enough. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983); *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 454 (4th Cir. 2017) (when "seeking prospective declaratory and injunctive relief rather than damages, . . . allegations in the [c]omplaint of past injuries do[] not in [themselves] show a present case or controversy" (internal quotation marks omitted)). Accordingly, we agree with the district court that because Oglesby is immune from Savage's damages claim, he should be dismissed from this suit altogether.

### III.

We turn next to the State's appeal of the district court order denying its motion to dismiss or for summary judgment. Again, we review the order de novo, taking Savage's factual allegations as true and drawing all reasonable inferences in his favor.

As noted above, once Oglesby was dismissed from the case, Savage amended his complaint to add the State as a defendant, based on the same factual predicate alleged against Oglesby, on the theory that the State is vicariously liable for Oglesby's actions. As a general rule, the Eleventh Amendment immunizes the states from vicarious liability for the acts of state employees like Oglesby. But Savage brought his action against

26

Maryland under Title VII, which abrogates that immunity for suits against a state in its capacity "as employer." *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 452 (1976). And although Maryland was not *Savage's* employer – Savage worked for Pocomoke City – Savage claims that Maryland can be held liable under a "third-party retaliatory interference" theory, for interfering with his employment relationship with the City through Oglesby's retaliatory actions.

The State resists what it views as an "end run" around its State's Attorney's absolute prosecutorial immunity: According to the State, if Oglesby is absolutely immune for his conduct, then so, too, should the State be immune as to claims arising from exactly the same factual allegations. And in any event, the State argues, Savage cannot state a claim for Title VII retaliation. Title VII's anti-retaliation provision makes it unlawful for "an employer to discriminate against any of *his employees* or applicants for employment," 42 U.S.C. § 2000e-3(a) (emphasis added), and according to the State, that plain text precludes a suit by non-employee Savage against the State of Maryland. Indeed, the State argues, because the abrogation of state sovereign immunity must be clear and unequivocal, *see Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001), recognizing Savage's novel third-party retaliatory interference claim in this case would raise substantial Eleventh Amendment concerns.

The parties have focused their briefing on these difficult and broadly consequential questions, but we decline to reach them here. This claim can be resolved on the narrower and more straightforward ground – also pressed by the State – that even assuming the State could be liable to Savage under Title VII's anti-retaliation provision

27

for Oglesby's conduct, Savage has failed to make out a Title VII retaliation claim based on that conduct. For that reason alone, Savage's claim should be dismissed. *See Strawser v. Atkins*, 290 F.3d 720, 730 (4th Cir. 2002) (declining to rule on the Eleventh Amendment issue, which "presents real difficulty," because "the statutory question here is easy"); *Parella v. Ret. Bd. of the R.I. Employees' Ret. Sys.*, 173 F.3d 46, 54, 56–57 (1st Cir. 1999) (courts may "bypass" difficult immunity issue if the "particular case presents an easy merits issue (favoring the defendant)").

The elements of a Title VII retaliation claim are familiar. In order to state a prima facie claim of Title VII retaliation, Savage must allege facts establishing that he engaged in protected activity, that his employer took an adverse employment action against him, and that there was a causal link between those events. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). Our focus here is on the first element, "protected activity," in which an employee like Savage engages if he opposes either employment actions "actually unlawful under Title VII" or "employment actions [he] reasonably believes to be unlawful." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (en banc) (internal quotation marks omitted). The State argues on appeal, as before the district court, that Savage's formal complaints about the April 2014 meeting do not meet that standard, because Oglesby's conduct during the meeting

28

was not unlawful under Title VII, and Savage could not reasonably have believed otherwise. We agree.[4]

In *Clark County School District v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam), the Supreme Court held that "[n]o reasonable person could have believed" that Title VII was violated in a workplace meeting during which a supervisor, in the course of reviewing job candidates' psychological evaluation reports, read aloud sexually explicit material from one of those reports in front of a female employee. Review of and exposure to the reports – including the offensive portions – was part of the "ordinary terms and conditions" of the plaintiff's job, the Supreme Court reasoned. *Id.* Given that context, the Court concluded, the plaintiff's subsequent complaint about the meeting could not constitute "protected activity," because no one reasonably could believe that the incident was sufficiently severe to establish a hostile workplace environment in violation of Title VII. *Id.* at 270–71.

The same reasoning applies to this very similar case. Again, we have the reading aloud of offensive material from a document at a work meeting; the document is germane to the meeting at which it is read; and dealing with such documents is part of the complaining employee's job. Indeed, Savage's own factual allegations make clear that "the ordinary terms and conditions" of his employment required at least some exposure to

---

[4] Savage's retaliation claim against Oglesby in his personal capacity is brought under the First Amendment, not Title VII, and so does not require Savage to establish this form of "protected activity." Accordingly, this defense to Savage's Title VII claim against the State does not apply to his claim against Oglesby, which we have resolved instead on absolute immunity grounds.

the documents and offensive language at issue, given that it was Savage himself who brought the letters to the meeting and presented them to Oglesby for review. If anything, the conduct alleged here is even more fully a part of the job than the conduct in *Breeden*: In *Breeden*, the plaintiff's supervisor not only read aloud but also commented on and, with another employee, laughed about the sexually explicit material in the report, 532 U.S. at 269–71, whereas Oglesby, according to Savage, read the letters verbatim with no editorial comment, stopping only to ask whether he was offending anyone. In this context, and in light of the holding in *Breeden*, we think it is clear that the April 2014 meeting did not rise to the level of a hostile work environment under Title VII, and that Savage could not reasonably have believed that his grounds for complaint against Oglesby included a Title VII violation.

In arguing to the contrary, Savage reminds us that the racial slur read by Oglesby is particularly odious, and "pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). We do not doubt that for a moment. And we have held that even a single incident in which that epithet or one like it is directed at an employee may be "severe enough to engender a hostile work environment" in violation of Title VII. *See Boyer-Liberto*, 786 F.3d at 280 (holding that "single incident" in which employee was called a "porch monkey" gave rise to Title VII claim for hostile work environment). Likewise, an employer's repeated and continuous use of that slur, among others, to insult African-American employees and customers, even when not directed specifically at the complaining employee, is "sufficiently severe or pervasive (or both)" to create an unlawful hostile work environment. *Spriggs*, 242 F.3d at 184–85.

"Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Id.* at 185 (quoting *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)).

But context matters, as *Breeden* instructs, and the question is whether use of a racial epithet has created a "racially *hostile*" work environment. *Id.* (emphasis added); *see id.* at 184 ("We are, after all, concerned with the 'environment' of workplace hostility . . . ."). And while the employer in *Spriggs* used racial epithets in his own voice and to express his own insults, *id.* at 182, and the employer in *Boyer-Liberto* directed epithets at the plaintiff to "cap explicit, angry threats that she was on the verge of utilizing her supervisory powers to terminate [the plaintiff's] employment," 786 F.3d at 280, this case is decidedly different. On the facts as alleged by Savage, Oglesby was not aiming racial epithets at Savage, or, for that matter, at anyone else, or using slurs to give voice to his own views. Instead, he was reading the word "Nigga" aloud from letters written by criminal suspects, presented to him by a police officer in the course of a trial-preparation meeting. In that distinct context and without more, no inference of a racially hostile environment can be drawn, and it would not be reasonable to believe that a Title VII violation had occurred. For that reason, we reverse the district court's denial of the State's motion to dismiss Savage's Title VII retaliation claim against it.[5]

---

[5] We note that this is not the only occasion on which Savage and his two co-plaintiffs allege that they were confronted by racial epithets and other forms of racial harassment during the full course of their employment with Pocomoke City and the (Continued)

## IV.

For the reasons given above, the judgment of the district court is affirmed in part and reversed in part, and we remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

---

Criminal Enforcement Team, at the hands of multiple defendants to this action. As we noted at the outset, we deal here only with plaintiff Savage's claims arising from the conduct of defendant Oglesby – a small part of that broader litigation – and Savage does not allege any other instance in which Oglesby voiced racial epithets or otherwise created a hostile work environment. We of course express no view as to the merits of the plaintiffs' other claims, which remain pending before the district court.