RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0349p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

PATRICK H. STOCKDALE; SHANE DUNNING,

          *Plaintiffs-Appellees*,

    *v.*

KIM R. HELPER,

          *Defendant-Appellant*.

No. 20-5269

─────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:17-cv-00241—Eli J. Richardson, District Judge.

Argued: October 7, 2020

Decided and Filed: October 30, 2020

Before: SILER, SUTTON, and LARSEN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Heather C. Ross, TENNESSEE ATTORNEY GENERAL'S OFFICE, Nashville, Tennessee, for Appellant. Bryant Kroll, THE BLACKBURN FIRM, PLLC, Nashville, Tennessee, for Appellees. **ON BRIEF:** Heather C. Ross, Stephanie Bergmeyer, TENNESSEE ATTORNEY GENERAL'S OFFICE, Nashville, Tennessee, for Appellant. Bryant Kroll, W. Gary Blackburn, THE BLACKBURN FIRM, PLLC, Nashville, Tennessee, for Appellees.

─────────────

## OPINION

─────────────

SUTTON, Circuit Judge. A prosecutor plays many roles on the stage of a criminal case. Sometimes an advocate, sometimes an investigator, and sometimes an administrator. As an

advocate, she can present her case with complete immunity from after-the-fact lawsuits about the prosecution. But as an investigator or administrator, the immunity comes with qualifications.

Officers Pat Stockdale and Shane Dunning sued prosecutor Kim Helper after she sent an email to the Fairview City Manager that prompted their firing. The district court denied Helper's claims of absolute and qualified immunity. Because Helper's actions were not closely tied to the judicial process, absolute immunity does not apply. But because her conduct did not violate any clearly established law, qualified immunity protects her. We affirm in part and reverse in part.

I.

In Fairview, Tennessee, old grudges generated new conflicts that produced mutinous lawsuits. As a lieutenant in the police department, Stockdale became concerned about the department's relationship with two security firms and suspected that some officers had falsified documents to obtain secondary employment at the firms. He told Helper, the district attorney for Williamson County, that the wrongdoing had "reached a whole new level" and asked Helper to refer the matter to the Tennessee Bureau of Investigation. R.82-8 at 6. When she did not respond, Stockdale followed up four days later. Helper responded this time but said only that her "office will act as we deem appropriate." *Id.* at 8.

Less than two weeks after Stockdale raised these concerns, Police Chief Terry Harris announced his retirement. Helper had thoughts about who should replace him, which apparently did not include Stockdale or Dunning—another lieutenant in the department—both of whom she described as "wannabe Chiefs." R.1-3 at 3. She texted an associate, offering to go to bat for her preferred candidate. "God help us," she added, "if it's [D]unning [or] Stockdale." R.1-2 at 2.

A few weeks later, the Fairview Board of Commissioners held a meeting, and the city manager requested that the Williamson County Sheriff investigate the Fairview Police Department. The city manager placed Stockdale and Dunning on administrative leave. Helper told a colleague that her preferred candidate now stood a better shot. The Sheriff's office issued a report that included allegations of criminal conduct—that Stockdale used a credit card to break into a building and then assaulted someone. Helper did not bring criminal charges.

Stockdale and Dunning filed a lawsuit against Fairview and several others. They alleged violations of their free-speech rights under the First Amendment and Tennessee law. In the interim, Scott Collins became the city manager. After reviewing the Sheriff's report, he concluded that the allegations were "old and/or unsubstantiated" and did not justify firing Stockdale and Dunning. R.65 at 1. Collins reinstated the two lieutenants. When the detective who led the Sheriff's investigation emailed that "Pat and Shane will get $," Helper replied: "How are they getting $$$. They have been on paid leave[.]" R.82-8 at 84. After the detective explained that they settled the lawsuit, Helper responded: "Thx [I] still won't take their cases. So not sure how that will help them[.]" *Id.* at 85–86. She didn't "trust them at all." *Id.* at 86.

Stockdale and Dunning faced fresh troubles upon their return. The police department still lacked a chief, prompting Helper to recommend her preferred candidate. When she learned the department planned to eliminate some detective positions, she raised concerns about the decision, mentioned her concerns about the return of Stockdale and Dunning and her obligation to turn over exculpatory evidence, and offered her views about the departmental restructuring.

The mayor told Helper to speak to Collins, who decided to reinstate Stockdale and Dunning. Meanwhile, the mayor told Collins that Helper "did not like the proposed changes in the police department, and that she was considering . . . removing her prosecutors from Fairview court." R.58-8 at 11. When Collins called Helper, the discussion became heated. "[S]he seemed agitated . . . at . . . the proposed changes that were about to take place within the police department[.]" *Id.* at 5. Helper "explained that she was dissatisfied with the quality of cases that were coming from" the department. R.82-2 at 17. Helper thought the changes would make things "worse," leaving them with "inexperienced officers investigating cases." *Id.*

The conversation turned to Stockdale and Dunning. Helper talked about "some historical things that [had] happened," meaning "bringing people back to work who have sued," and said that she did "not lik[e] the direction of the Fairview Police Department as she knew it." *Id.* at 27. She explained that "she wouldn't be able to trust" Stockdale and Dunning. *Id.* at 31. Collins told Helper that she should put her concerns about them in writing.

Helper did just that: "Mr. Collins, per our discussion, this Office has concerns about reports initiated/investigated solely by Officers Shane Dunning or Pat Stockdale." R.1-12 at 2. Due to the information in the Sheriff's report, she explained, "we will be required to turn that report over to defense counsel in cases where Officers Dunning and/or Stockdale are involved." *Id.* As Helper put it, "[w]ithout independent corroboration from another law enforcement officer and/or independent witness, the[ir] testimony . . . may be impeached" under *Giglio v. United States*, 405 U.S. 150 (1972). R.1-12 at 2.

Collins disputed Helper's assessment. But Helper refused to withdraw the email, insisting "she was comfortable" with it. R.82-2 at 34. Collins fired Stockdale and Dunning, explaining the email provided the "sole reason." R.83 at 71.

Stockdale and Dunning sued Helper and the City of Fairview. They settled their claims against the city, leaving a First Amendment claim and state law claims against Helper.

At summary judgment, the district court denied (1) Helper's claim of absolute immunity and (2) her claim for qualified immunity from the federal First Amendment retaliation claim. It also denied her summary judgment with respect to state law claims for official oppression and tortious interference with a business relationship.

II.

*Absolute Immunity*. Absolute immunity applies to functions "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). The "analytical key to prosecutorial immunity . . . is *advocacy*—whether the actions in question are those of an advocate." *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000). Even when a prosecutor acts in an administrative capacity, not as an advocate, they still "enjoy[] absolute immunity if the act is done in service of an advocacy function." *Safar v. Tingle*, 859 F.3d 241, 249 (4th Cir. 2017); *see also Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006). So long as it is "directly connected with the conduct of a trial," even administrative conduct stands behind the barricade of absolute immunity. *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009). But acts that merely "safeguard[] the fairness of the criminal judicial process"—say a prosecutor offering legal advice to officers during an investigation—do not necessarily warrant

absolute immunity. *Burns v. Reed*, 500 U.S. 478, 495 (1991). Because we grant absolute immunity only "sparing[ly]," officials seeking its ironclad protection "bear[] the burden" of showing that qualified immunity does not suffice. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quotation omitted). Think of qualified immunity as a face mask and absolute immunity as a vaccine, with a presumption that qualified immunity is fit for the job. *Id.*

The stage set, Helper's conduct falls on the unprotected side of the line. The sequencing of her conduct goes a long way to showing why. Consider all of the personnel-driven actions she took *before* she mentioned anything about *Giglio* or the handling of future criminal prosecutions. She actively promoted a candidate for chief of police. She texted the mayor about personnel restructuring at the department. She lamented that the department brought people back "who have sued." R.82-2 at 27. And she complained about Collins' plan to eliminate detectives. Only after Collins requested her thoughts in writing on the department's "reorganization" did Helper respond by mentioning her exculpatory obligations under *Giglio*. R.1-12 at 2. Just as words are known by the company they keep, Helper's actions are known by the backdrop of these communications. Helper's email may well have been an act of advocacy; it just wasn't case-driven advocacy. Her meddling with the hiring and firing decisions at the police department simply was not "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. She has not carried her burden to show that absolute immunity applies.

Look at it this way. She could not offer the police department a long train of grounds for making race-based or faith-based hiring decisions, then inoculate herself from attack by saying the failure to accept her suggestions would affect future motions and decisions in pending cases involving the department. The same is true for future free-speech claims by Stockdale and Dunning. They could not libel someone in a video, then claim it was protected speech because the video contained a burning American flag in the background. *See United States v. Jeffries*, 692 F.3d 473, 482 (6th Cir. 2012).

Nor did Helper's administrative kibitzing serve a traditional advocacy function. *Safar*, 859 F.3d at 249. The record does not suggest that Helper's conduct related to the "initiation and conduct of a prosecution." *Burns*, 500 U.S. at 492. No identified trial loomed, and Helper never

mentioned a criminal case. "Almost any action by a prosecutor," it could be said, at some point, was "in some way related to the ultimate decision whether to prosecute." *Id.* at 495. But she tried only to affect personnel decisions in the department, not to win a case. Helper, again, has not carried her burden. It falls on her to show that her administrative actions are worthy of absolute, as opposed to qualified, protection.

Case law supports this conclusion. *Forrester v. White* ruled that a judge "act[ed] in an administrative capacity when he demoted and discharged" an employee. 484 U.S. 219, 229 (1988). That sounds like Helper's actions. By emailing Collins in the context of a restructuring discussion, she caused Stockdale and Dunning's firing. That Helper did not make the employment decision herself does not change things when it comes to absolute immunity. "It would be passing strange to hold that while a prosecutor is not immune from liability for firing his own employees, he is immune for getting others to fire their employees." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1143 (11th Cir. 2017).

Absolute immunity ensures "that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation," *Butz v. Economou*, 438 U.S. 478, 512 (1978), without, in the words of Judge Learned Hand, the "constant dread of retaliation," *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949). But these considerations don't apply when prosecutors wade uninvited into the fraught waters of another agency's personnel decisions.

Helper responds that any decision about Stockdale and Dunning's ability to testify in an actual case would be shielded by absolute immunity and cannot be divorced from her communications with Collins. True, absolute immunity applies to a prosecutor's decision not to prosecute a case involving individual police officers, no matter the motive. *Roe v. City & Cnty. of San Francisco*, 109 F.3d 578, 583–84 (9th Cir. 1997); *Harrington v. Almy*, 977 F.2d 37, 40–41 (1st Cir. 1992). But communicating with an officer's supervisor before a criminal proceeding even exists is a distinct act that we assess on its own terms. *See Torres v. Goddard*, 793 F.3d 1046, 1052 (9th Cir. 2015). The Supreme Court confirmed as much in *Kalina v. Fletcher*, when it evaluated each act in filing criminal charging documents separately, explaining how a prosecutor could be immune for filing an "information and the motion for an arrest warrant" but

not for "personally attesting to the truth of the averments in the certification." 522 U.S. 118, 129 (1997).

Helper insists that *Van de Kamp* shows that, even if communicating a decision about a case amounts to a separate act, it still receives complete immunity. But *Van de Kamp* involved a claim against supervisors after a line prosecutor "failed to disclose impeachment material" at trial. 555 U.S. at 339. The Court held that "prosecutors involved in such supervision or training or information-system management" are entitled to absolute immunity too. *Id.* at 344. Because the administrative failures related to "an individual prosecutor's error in the plaintiff's specific criminal trial," absolute immunity attached to those supervisors acting in an administrative capacity. *Id.* That's not Helper's situation. Her communication did not relate to an ongoing prosecution or trial. *Van de Kamp* protects decisions tied to the trial process; it does not protect a prosecutor keen on influencing personnel decisions in cities within her jurisdiction.

Helper protests that the key email conveyed just her *Giglio* decision, and it concerned just the assessment of future witnesses. But a single act may serve different ends. Kneeling on one knee might presage picking up litter or proposing. *Torres*, 793 F.3d at 1053. By then, Helper had actively involved herself in the personnel decisions at the police department, confirming that her last-minute general references to exculpatory evidence arose in the main from efforts to fire the two lieutenants, not to manage a case.

Making Helper's defense more tenuous is the yawning gap between the accusations against Stockdale and Dunning and a *Giglio* obligation. While prosecutors must generally turn over material evidence favorable to a defendant, *Brady v. Maryland*, 373 U.S. 83, 87 (1963), that does not include generic evidence about prior bad acts with only a "tenuous connection" to a pending case. *See Hogan v. Hanks*, 97 F.3d 189, 191 (7th Cir. 1996). So far as the record shows, Stockdale allegedly used a credit card to enter homes and allegedly assaulted someone—events that occurred over ten years before Helper's communications. But Helper offers no explanation how these musty accusations—upon which she did not act in bringing a prosecution—would amount to *Brady* material in *all* future cases. No less importantly, the report was public. A *Brady* violation requires that "evidence must have been suppressed by the State." *Strickler v. Greene*, 527 U.S. 263, 282 (1999). It follows that publicly available information

generally does not trigger a *Brady* obligation. *See Bell v. Bell*, 512 F.3d 223, 236 (6th Cir. 2008). If "information is readily available to the defense from another source, there simply is nothing for the government" to turn over. *Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007). *Brady*, in short, generally "does not apply when information is available for the asking." *United States v. Johnson*, 911 F.3d 849, 852 (7th Cir. 2018); *see also Puertas v. Overton*, 168 F. App'x 689, 695 (6th Cir. 2006) (noting that widespread "public knowledge of the investigation" usually does not trigger a *Brady* obligation). Helper has not explained, has not even begun to explain, why a public report would trigger a blanket *Giglio* obligation in all cases involving Stockdale and Dunning.

What of the possibility that some case in the future, even just one case, could trigger a *Giglio* obligation? That hurts Helper; it does not help her. For one, it's doubtful that absolute immunity applies before the prosecutor actually files a pleading motion to that effect as opposed to a generic letter about generic cases. Protecting actions detached from the "initiation and conduct of a prosecution" risks stretching absolute immunity beyond reasonable bounds. *Burns*, 500 U.S. at 492. No identifiable trial loomed, and Helper never mentioned a pending criminal case involving Stockdale or Dunning in her conversations with Fairview officials about their employment. For another, turning over evidence under *Giglio* in an actual case would be protected. At least in this context, she needs to wait for that case or at least identify some reason why a blanket motion would plausibly be required. It's no doubt the case that a prosecutor can make a blanket decision, and an unchallengeable decision, with respect to all prosecutions involving certain officers. *See Savage v. Maryland*, 896 F.3d 260, 270 (4th Cir. 2018); *Botello v. Gammick*, 413 F.3d 971, 977 (9th Cir. 2005). She just must offer an explanation for the decision.

A restless mind might wonder if we are effectively rejecting Helper's defense on pretext grounds. Not so. So "strong" is the "medicine" of absolute immunity, *Forrester*, 484 U.S. at 230 (quotation omitted), that it does not delve into a prosecutor's motive. So long as the acts amount to advocacy, the protection applies without regard to the prosecutor's state of mind. *Bradley v. Fisher*, 80 U.S. 335, 347–48 (1871); *see also Cady v. Arenac Cnty.*, 574 F.3d 334, 341 (6th Cir. 2009). The issue thus is not whether Helper's purported explanations amounted to

the true explanations for her email.  It's whether the email concerned case-related advocacy.  To illustrate the point, we ask not whether Helper acted because Stockdale and Dunning violated police ethics, wore the wrong clothes to the office, or shot an unwanted glance at Helper in the hallway.  Her motivations are beside the point.  We ask only whether she functioned as a prosecutor when she involved herself in the department's personnel decisions.  She did not.

*Savage v. Maryland* does not alter this conclusion.  896 F.3d 260 (4th Cir. 2018).  A Black police officer sued the State's attorney after he retaliated against him for filing a complaint about using racial epithets.  *Id.* at 265–66.  The prosecutor sent a letter to city officials, questioning the officer's veracity, explaining that he would have to disclose material about him to defense counsel, and suggesting that all of the officer's cases would be dismissed absent corroborating evidence.  *Id.* at 266.  A year later, the prosecutor followed up and explained that the officer "would never be able to testify again and was thus useless" to the department.  *Id.*  The Fourth Circuit applied absolute immunity.  Even if a "judgment about witness credibility or which cases to try has a negative employment consequence," it reasoned, that "does not change the underlying nature of the judgment."  *Id.* at 272.  It saw the prosecutor's decision to communicate with city officials as "inextricably linked with the underlying assessment" of the officer's credibility.  *Id.* at 273.  But context drives the inquiry.  Nothing in *Savage* indicates that the prosecutor gratuitously involved himself in the police department's employment decisions.  It homed in on the "prosecutor's decision, conveyed to the officer's employer."  *Id.* at 271.  Helper's email followed a pattern of messages, phone calls, and emails focused on personnel matters, not cases.  *Cf. Beck v. Phillips*, 685 N.W.2d 637, 643 (Iowa 2004).  Had Helper sent one email related to her case duties, as in *Savage,* it's easy to see our case coming out differently.  But the record reveals a concerted effort to act as a quasi-employer focused on staffing decisions, capped by an unexplained, sudden, and across-the-board *Giglio* claim.  That's not what happened in *Savage*.

Neither does *Botello v. Gammick* reveal a better path.  413 F.3d 971 (9th Cir. 2005).  After an officer raised concerns about an investigation, prosecutors sought to sabotage his job prospects by calling his new employer—a school police department—falsely defaming his character and insisting that he "must not be permitted to participate in any investigations . . . no

matter how preliminary and no matter whether other investigators were available to testify." *Id.* at 974. They added that they "would refuse to file any case where [he] participated in any phase of the investigation." *Id.* The Ninth Circuit concluded that absolute immunity did not protect the prosecutors' attempts to "usurp . . . staffing decisions" but did shield their decision, and communication, about their non-prosecution policy. *Id.* at 978. It reasoned that "[w]hen they involved themselves in the School Police Department's personnel decision . . . they were at best performing an administrative function and, as such, could only be entitled to qualified immunity." *Id.* at 977. On top of that, they "failed to demonstrate a connection between their unexplained, unqualified blanket prohibition on [his] involvement in any aspect of an investigation and the judicial process." *Id.* at 978. Prosecutors, the Ninth Circuit reasoned, are not empowered to "dictat[e] to local law enforcement authorities how future criminal investigations should be . . . staffed." *Id.* at 977. *Botello* favors Stockdale and Dunning, not the other way around. True, absolute immunity shielded the prosecutors' non-prosecution pact, but Helper's conduct is more akin to dictating how "investigations should be . . . staffed." *Id.* Remember the context of her email. Collins asked Helper to "assist" him with the department's "reorganization." R.1-12 at 2. In that light, she embraced an administrative function by influencing who would investigate crimes. *Botello*, 413 F.3d at 977. And just as the prosecutors in *Botello* failed to justify their "unexplained, unqualified" blanket prohibition on the officer's investigative activities, Helper's email offered no justification and no principle tied to the judicial process. It falls on her to show that qualified immunity offers too little protection for that kind of act. She has not done that.

All in all, absolute immunity does not bar the federal First Amendment claim against Helper. A like conclusion applies to Helper's request for absolute immunity on the state law claims because the same inquiry controls it, as the parties agree.

### III.

*Qualified Immunity*. That leaves Helper's qualified immunity defense against Stockdale and Dunning's § 1983 claim. It turns on whether Helper (1) violated constitutional guarantees (2) that were "clearly established" at the time she acted. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009).

The district court left one federal claim standing: a First Amendment claim that Helper retaliated against the officers for filing a prior lawsuit. To bring such a claim, Stockdale and Dunning had to show that (1) they engaged in protected activity under the First Amendment, (2) Helper took an adverse action against them, and (3) Helper did so in response to their protected activity. *Mattox v. City of Forest Park*, 183 F.3d 515, 520 (6th Cir. 1999).

We can resolve the claim on the ground that Helper did not violate any clearly established law. *See Pearson*, 555 U.S. at 227. To meet this imperative, the claimant must show that case law put the issue "beyond debate." *Aschroft v. al-Kidd*, 563 U.S. 731, 741 (2011). That simply was not the case here.

Ask what Helper would have seen had she consulted precedent before acting. She would have encountered a tangle of cases about absolute immunity, most of which favored the prosecutor as just shown. That it has taken numerous pages in the federal reporter to make sense of the issue sends a first signal that liability is far from clearly established. Because a reasonable prosecutor would have found the *absolute* immunity question a close one in this context, that strongly suggests that *qualified* immunity applies.

Ask then what Helper would have seen in the case law when it comes to retaliation claims and the liability of decision makers versus non-decision makers. Recall that she did not have authority to fire Stockdale and Dunning. Collins made the call. She was not the decision maker. That matters. In *Shehee v. Luttrell*, a prisoner lost his job at the commissary and sued several prison officials, including some with no involvement in employment decisions but who "instigated" his firing. 199 F.3d 295, 301 (6th Cir. 1999). We held the prisoner could not state a claim for retaliation against them because neither had "the ability to terminate Shehee." *Id.* So too of Helper, at least when it comes to clearly established law. While she might have set Collins' decision in motion, she had no power to make it. All agree that Helper's email about *Giglio* provided the "sole reason" for Collins to fire Stockdale and Dunning. R.83 at 71. Instigating a firing by another is debatable territory, making it highly improbable that communicating exculpatory evidence obligations amounts to clearly forbidden territory.

*Campbell v. Mack* does not alter the calculus. 777 F. App'x 122 (6th Cir. 2019). It acknowledged the tenet, sure enough, that a public official violates the First Amendment by retaliating against an individual for exercising free speech rights. *See id.* at 136. But *Campbell* did not involve a lawsuit against an official who did not, and could not, take the adverse action.

So too of *Fritz v. Charter Township of Comstock* (*Fritz I*), 592 F.3d 718 (6th Cir. 2010). It allowed a retaliation claim against a public official who pressured a private employer to take adverse action in response to protected speech. *Id.* at 724. But along the way, we noted that because the plaintiff was "not a public employee, . . . the level of injury she must allege would be the lower limit of a cognizable injury." *Id.* One could stop reading right there. Because Stockdale and Dunning were public (not private) employees, *Fritz* failed to put Helper on clear notice that precipitating their firing offends the Constitution. Read on and you will see that *Fritz* called the question a "close" one that turns on whether an official "ha[d] the power to substantially affect" the employer's "ability to do business in" the city. *Id.* at 726; *see also Fritz v. Charter Twp. of Comstock* (*Fritz II*), 463 F. App'x 493, 500 (6th Cir. 2012). Consider too that the *Fritz* official explicitly complained about the plaintiff's conduct to her employer. *Fritz*, 592 F.3d at 720–21. The only communication upon which Collins relied in making the decision concerned Helper's exculpatory obligations, not other complaints.

One loose end remains. In addition to Stockdale and Dunning's First Amendment retaliation claim, the district court denied Helper summary judgment on their state claims for official oppression and tortious interference with a business relationship. We leave it to the district court to decide in the first instance whether to exercise supplemental jurisdiction over these claims and, if so, to decide whether Tennessee law grants qualified immunity to them.

We affirm the district court's denial of absolute immunity and reverse its denial of qualified immunity with respect to Stockdale and Dunning's First Amendment retaliation claim. That claim is therefore dismissed, and we remand the state law claims to the district court for its disposition in the first instance.