# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
October 3, 2023 Session

## PATRICK STOCKDALE ET AL. v. KIM HELPER

**Appeal from the Circuit Court for Williamson County**
**No. 21-C-302      Don R. Ash, Senior Judge**
_____

### No. M2022-00846-COA-R3-CV
_____

The plaintiffs, who are former employees of a municipal police department, were discharged after the District Attorney General sent an email to the city manager stating that the plaintiffs' testimony at hearings may be impeached without independent corroboration, thus allegedly "creating challenges for the State in proving its case beyond a reasonable doubt." The plaintiffs thereafter brought suit against the District Attorney General and specifically asserted claims for official oppression under a negligence per se theory and for tortious interference with a business relationship and prospective business relationships. The trial court dismissed the plaintiffs' claims on the grounds of qualified immunity and absolute immunity. The plaintiffs appealed, and during the pendency of the appeal, the District Attorney General died. The personal representative of her estate, who was substituted as the appellee in the wake of her death, has argued that this case abated upon her death because the plaintiffs' lawsuit is "for wrongs affecting the character of the plaintiff" within the meaning of Tennessee Code Annotated section 20-5-102. For the reasons discussed herein, we conclude that the plaintiffs' claims for tortious interference abated upon the District Attorney General's death. Assuming, arguendo, that the plaintiffs' separate pursuit of recovery under a negligence per se theory did not abate, we nonetheless affirm the dismissal of the plaintiffs' negligence per se theory due to their failure to raise an effective challenge to the dismissal of the theory in their appellate briefing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part; Modified in part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

W. Gary Blackburn and Bryant Kroll, Nashville, Tennessee, for the appellants, Shane Dunning and Patrick Stockdale.

Jonathan Skrmetti, Attorney General and Reporter, Andrée Sophia Blumstein, Solicitor General, and Heather Ross, Senior Assistant Attorney General, for the appellee, Gerald M.

Helper, Jr.

# OPINION

## BACKGROUND AND PROCEDURAL HISTORY

Patrick Stockdale ("Mr. Stockdale") and Shane Dunning ("Mr. Dunning") are former lieutenants with the Fairview Police Department ("FVPD") in Williamson County, Tennessee. Although now deceased, the named Defendant in this litigation, Kim Helper ("General Helper"), was formerly the District Attorney General for the Twenty-First Judicial District for the State of Tennessee.

Mr. Stockdale and Mr. Dunning (collectively, "the Plaintiffs") initiated the present ligation against General Helper[1] in the Williamson County Circuit Court ("the trial court") by chronicling a series of events—and General Helper's alleged involvement in them— that ultimately culminated in their respective terminations from the FVPD. The backdrop of this case is marked by concerns that surrounded the FVPD and an ensuing investigation into it.

According to the allegations in the filed complaint, Mr. Stockdale contacted General Helper in early February 2016 to express his concerns about the FVPD's relationship with certain security firms that employed Fairview officers. In relevant part, the complaint alleged that the owners of these security firms, who were Fairview auxiliary officers, were allowed by Chief Terry Harris ("Chief Harris") and Assistant Chief Mark Sutton "to have free-reign at Fairview." Further, the complaint stated, the security firm owners "openly stated to corporals, sergeants and lieutenants that they only answered to [Chief Harris]." General Helper allegedly did not respond when Mr. Stockdale made certain requests of her in relation to issues surrounding the FVPD, including one request for "prosecutorial guidance."

During a February 29, 2016, meeting, the Fairview Board of Commissioners ("the Board") and the then City Manager called Williamson County Sheriff Jeff Long and requested that he investigate the FVPD. The Board wanted an outside agency to review the department because it had concerns about the fractured nature of the FVPD. One Commissioner had actually described the FVPD as "a disaster." General Helper did not attend the February 29, 2016, meeting.

The Plaintiffs were thereafter placed on administrative leave by the then City Manager on March 1, 2016. According to the complaint, the Plaintiffs were informed that the decision was made to "insure the integrity of the investigation" into the FVPD. General Helper did not ask for the Plaintiffs to be placed on administrative leave.

---

[1] Per the complaint, General Helper was sued "in her individual capacity only."

- 2 -

Sheriff Long told General Helper that his office, the Williamson County Sheriff's Office ("WCSO"), was going to investigate the FVPD, and although General Helper offered to request an investigation by the Tennessee Bureau of Investigation, Sheriff Long declined. Sheriff Long assigned the WCSO investigation of the FVPD to lead Detective Tameka Sanders and a Sergeant Sheldon. Detective Sanders determined who would be interviewed and initiated contact with the interviewees, and further, Detective Sanders and Sergeant Sheldon interviewed everyone that was then employed by the FVPD who was not on suspension.

Although certain allegations against the Plaintiffs were inquired into as part of the investigation, General Helper determined upon review of a report from the WCSO that there was no evidence to support the prosecution of any party. A version of the WCSO report was published on the City of Fairview website, and per the Plaintiffs' complaint, the report "was picked up by the media and widely reported."

In their complaint, the Plaintiffs recounted how, the day after the WCSO report was published, they filed a lawsuit in federal court asserting various causes of action, including for defamation and false light, against the City of Fairview and other defendants ("the Fairview lawsuit"). General Helper was not a party to the Fairview lawsuit. Although the then City Manager served notices of intended dismissal on the Plaintiffs shortly after the Fairview lawsuit was filed, the Plaintiffs noted in their complaint in this matter that Scott Collins ("City Manager Collins"), who took over as City Manager on August 1, 2016, later concluded that reinstatement of the Plaintiffs to their positions from administrative leave would be proper. The Fairview lawsuit was settled, and the Plaintiffs returned to work on or about September 1, 2016.

The record reflects that plans were made to restructure the FVPD, and in the fall of 2016, General Helper acted to express her concerns over the restructuring. Fairview's mayor told General Helper that she needed to speak with City Manager Collins, and although City Manager Collins subsequently listened to General Helper's concerns, he rejected them. Of note, the Plaintiffs alleged that, during the phone conversation that had ensued between General Helper and City Manager Collins, the discussion turned to General Helper's intent to not prosecute any cases in which the Plaintiffs may be involved.

Later, on October 20, 2016, General Helper sent an email (hereinafter "the *Giglio* email") to City Manager Collins wherein she wrote as follows:

> Mr. Collins, per our discussion, this Office has concerns about reports initiated/investigated solely by Officers Shane Dunning or Pat Stockdale. Because of the information contained in the Williamson County Sheriff's Department Investigative report, we will be required to turn that report over to defense counsel in cases where Officers Dunning and/or Stockdale are involved. Without independent corroboration from another law enforcement

- 3 -

officer and/or independent witness, the testimony of Officers Dunning and/or Stockdale may be impeached, thus creating challenges for the State in proving its case beyond a reasonable doubt. (Giglio v. United States, 405 U.S. 150 (1972)).

Subsequently, on October 31, 2016, City Manager Collins served the Plaintiffs with notices of intended dismissal. The notices indicated that the assertions of the *Giglio* email from General Helper nullified the Plaintiffs' ability to act independently and credibly as law enforcement officers. Thereafter, on December 6, 2016, the City of Fairview held a meeting/pre-termination hearing regarding the Plaintiffs' employment, and City Manager Collins terminated their employment. City Manager Collins testified at the December 6, 2016, hearing that the *Giglio* email was the sole reason for the Plaintiffs' terminations.

The Plaintiffs' terminations prompted their pursuit of legal relief yet again, but of note, before the present state court action was filed, the Plaintiffs sued General Helper in federal court.[2] In addition to asserting a First Amendment retaliation claim against General Helper, the Plaintiffs asserted state law claims against her. *Stockdale v. Helper*, 979 F.3d 498, 502 (6th Cir. 2020). In reviewing the federal district court's denial of a claim of absolute immunity by General Helper and her claim for qualified immunity relative to the First Amendment retaliation claim, the Sixth Circuit Court of Appeals initially held that "absolute immunity does not bar the federal First Amendment claim" and that a "like conclusion applies to Helper's request for absolute immunity on the state law claims." *Id.* at 506. As for the merits of General Helper's qualified immunity defense vis-à-vis the federal retaliation claim, the Sixth Circuit opined as follows:

> We can resolve the claim on the ground that Helper did not violate any clearly established law. . . .
>
> Ask what Helper would have seen had she consulted precedent before acting. She would have encountered a tangle of cases about absolute immunity, most of which favored the prosecutor as just shown. That it has taken numerous pages in the federal reporter to make sense of the issue sends a first signal that liability is far from clearly established. Because a reasonable prosecutor would have found the *absolute* immunity question a close one in this context, that strongly suggests *qualified* immunity applies.

*Id.* at 506-07. Although the federal district court's denial of qualified immunity regarding the First Amendment claim was ultimately reversed, the Sixth Circuit's opinion concluded by leaving it to the district court "to decide in the first instance whether to exercise supplemental jurisdiction over [the Plaintiffs' claims under state law] and, if so, to decide

---

[2] This federal proceeding also involved the City of Fairview, but the claims against the City were settled. *See Stockdale v. Helper*, 979 F.3d 498, 502 (6th Cir. 2020).

whether Tennessee law grants qualified immunity to them." *Id.* at 507. The district court declined, however, to exercise jurisdiction over these remaining claims.

The district court's declination of jurisdiction over the state law claims in turn precipitated the present litigation, and we note that the Plaintiffs' complaint in the trial court expressly stated that it was filed in order "to pursue [the Plaintiffs'] state law claims." The asserted state law claims, which were for official oppression under a negligence per se theory and for tortious interference with a business relationship and prospective business relationships, soon met active opposition from General Helper.

As is relevant to this appeal, General Helper filed a motion to dismiss and/or for summary judgment and asserted therein that the doctrine of absolute prosecutorial immunity, as well as the doctrine of qualified/common law immunity, barred all claims against her. In response, the Plaintiffs claimed that General Helper did not enjoy absolute immunity. Contending that the issue had already been determined by the Sixth Circuit, the Plaintiffs argued that the defense was "therefore barred under the doctrines of res judicata and collateral estoppel." The Plaintiffs also submitted that the defense of qualified immunity did not apply to their state law claims. The trial court ultimately granted General Helper relief, specifically finding that (a) "the doctrine of res judicata and/or collateral estoppel do not apply" and that (b) General Helper was entitled to absolute immunity and qualified immunity. In connection with its determination that General Helper was entitled to absolute immunity, the trial court noted that it "does not find General Helper was acting outside the scope of her duties as a prosecutor when she sent the *Giglio* email to [City Manager] Collins" and that, because the act of sending the email was the basis for the Plaintiffs' state law claims, absolute immunity barred recovery. In deeming General Helper was entitled to qualified immunity, the court specifically noted that "it was reasonable General Helper voiced her concerns about the Plaintiffs' professional performances" and that there was "no clearly established right of the Plaintiffs to which General Helper is alleged to have violated." The Plaintiffs thereafter appealed to this Court, and while the appeal was pending, General Helper passed away.

Although the Plaintiffs moved to substitute the personal representative of General Helper's estate as a party, a filing in opposition to the motion argued that the Plaintiffs' action had actually abated upon the death of General Helper. Whereas this Court subsequently entered an order directing that the personal representative of General Helper's estate ("the Appellee") be substituted in her place before this Court, we also directed through the same order that "[t]he appellee's brief shall address whether the action abated upon the death of . . . [General] Helper, and the [Plaintiffs] may respond in their reply brief."

## ISSUES PRESENTED

The Plaintiffs raise the following issues on appeal, restated verbatim from their

brief:

1. Whether the trial court erred in finding that Gen. Helper enjoyed absolute immunity from state-law tort claims when she was not acting within the scope of her authority as a prosecutor or performing a prosecutorial function?

2. Whether the trial court erred when it applied the federal qualified immunity analysis reserved for Section 1983 constitutional claims to state law claims of tortious interference with business relationships and prospective business relationships?

3. Whether the trial court erred when it granted summary judgment based on disputed material facts?

Although the Appellee discerns no error in the trial court's dismissal of this case, he raises the following as an independent primary issue for our review:

Whether this action abated upon the death of Defendant District Attorney General Kim Helper.

## DISCUSSION

We begin our discussion by evaluating the Appellee's contention that this action abated upon the death of General Helper. The Appellee's argument concerning abatement is grounded in Tennessee Code Annotated section 20-5-102, which provides as follows:

No civil action commenced, whether founded on wrongs or contracts, except actions for wrongs affecting the character of the plaintiff, shall abate by the death of either party, but may be revived; nor shall any right of action arising hereafter based on the wrongful act or omission of another, except actions for wrongs affecting the character, be abated by the death of the party wronged; but the right of action shall pass in like manner as the right of action described in § 20-5-106.

Tenn. Code Ann. § 20-5-102.

According to the Appellee, this case involves an action for wrongs affecting the character of the Plaintiffs. Citing *Bolin v. Stewart*, 66 Tenn. 298 (1874), the Appellee has further specifically argued, correctly, that, where an action is for wrongs affecting the character of the plaintiff and the defendant has, as here, prevailed in the trial court and died

pending appeal, the action abates.[3]  In support of his position on abatement, the Appellee has focused on the fact that the Plaintiffs' complaint takes issue with General Helper's action in sending the *Giglio* email, an action which the Appellee submits is "conduct drawing into question Plaintiffs' credibility as witnesses" and an action which the Plaintiffs themselves alleged was one "of such universal significance in the law enforcement community that it will effectively end any officer's career."

With respect to the question of abatement, the Tennessee Supreme Court has noted that actions for libel, for malicious prosecution, and for breach of a marriage contract, among others, have all been held to involve the character of the plaintiff. *Bowman v. Hart*, 33 S.W.2d 58, 59 (Tenn. 1930) (collecting cases).  Of course, none of these particular claims are at issue here, and the question before us, naturally, is whether the claims in this case involve "wrongs affecting the character" of the Plaintiffs.  If they do, then the Appellee would be correct concerning his position with regard to abatement.

To evaluate the merits of the abatement issue, we initially turn our focus to the Plaintiffs' claims for tortious interference with a business relationship and prospective business relationships, claims through which the Plaintiffs specifically seek recovery here as a result of being allegedly falsely "*Giglio* impaired."  Although this *Giglio* impairment is not nominally couched as a "scarlet letter" in the Plaintiffs' complaint, such is the gist of the impairment as alleged by the Plaintiffs.  Indeed, as noted earlier and as the Appellee has emphasized in his briefing, the Plaintiffs submit that being "*Giglio* impaired" is "an act of such universal significance in the law enforcement community that it will effectively end any officer's career."

"It is well settled that whether an action survives depends on the substance of the cause of action, not on the forms of proceeding to enforce it." *Bowman v. Hart*, 33 S.W.2d 58, 59 (Tenn. 1930).  The case law further instructs that the type of evidence that is competent, and the type of damages that are available, are relevant to determining whether "wrongs affecting the character of the plaintiff" are involved.  For instance, in one of the decisions cited by the Appellee, the Tennessee Supreme Court noted that, "[i]f evidence as to character is competent, then it necessarily follows that the question of character is directly involved." *Justice v. Clinard*, 217 S.W. 663, 665 (Tenn.1920).  In another decision, also referenced by the Appellee, the Tennessee Supreme Court placed emphasis on the subject of available damages, stating as follows: "Being entitled to recover damages 'for injury to his reputation,' his reputation or character, in contemplation of law, was

---

[3] By way of referencing *Pickens v. Scarbrough*, 46 S.W.2d 58 (Tenn. 1932), the Appellee has signaled the propriety of a different outcome when a plaintiff receives a judgment in the trial court. *See id.* at 58-59 (countenancing revivor in a case where the plaintiff received a judgment in the trial court and, after judgment, the defendant died pending the disposition of his appeal).

affected by the wrongs complained of in the declaration, and the action or suit abated by the death of defendant." *Bolin*, 66 Tenn. at 300.

In view of the authorities referenced immediately above, we conclude that the Plaintiffs' claims for tortious interference here—claims which stem from the alleged "false *Giglio* impairment of the Plaintiffs"—were "for wrongs affecting the character of the plaintiff." Indeed, this conclusion becomes manifest when we consider that additional case law reveals that a plaintiff's reputation is itself within the scope of inquiry under a claim for tortious interference with a business relationship and prospective business relationships. *See Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Distrib. Co.*, 734 S.W.2d 322, 324–25 (Tenn. 1987) (citing favorably to the position in the Restatement (Second) of Torts which provides that the measure of damages can include harm to reputation); *B & L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 222 (Tenn. Ct. App. 2004) (quoting at length from the decision in *Dorsett Carpet Mills*); *Springfield Invs., LLC v. Glob. Invs., LLC*, No. E2014-01703-COA-R3-CV, 2015 WL 5064090, at *17 (Tenn. Ct. App. Aug. 27, 2015) (noting that damages for a successful claim of intentional interference with business relationships include actual harm to reputation). "Being entitled to recover damages 'for injury to [their] reputation[s],' [the Plaintiffs'] reputation[s] or character[s], in contemplation of law, [were] affected by the wrongs complained of in the declaration, and the action or suit abated by the death of defendant." *Bolin*, 66 Tenn. at 300.

As for the Plaintiffs' remaining legal theory of recovery that was dismissed by the trial court, i.e., negligence per se, it is not immediately clear upon initial examination as to whether the Plaintiffs' pursuit of recovery under that theory should be considered to be "for wrongs affecting the character of the plaintiff" so as to be abated upon General Helper's death. However, we need not tax the length of this Opinion or further prolong resolution of this case by examining the question in any great detail, for we are of the view that the Plaintiffs' pursuit of recovery is foreclosed irrespective of the question of abatement. Indeed, assuming arguendo for purposes of our disposition that the Plaintiffs' pursuit of recovery under a negligence per se theory was not abated upon the death of General Helper, we note that the Plaintiffs' brief ultimately fails to raise an effective challenge to the court's dismissal of the negligence per se count. As to this point, we observe that although the trial court clearly dismissed the Plaintiffs' negligence per se claims due to the doctrine of qualified immunity, the Plaintiffs' raised issue regarding qualified immunity, as evident from our reproduction of the raised issues above, only speaks to their attempt to recover for alleged tortious interference with business relationships and alleged tortious interference with prospective business relationships. The Plaintiffs have thus failed to properly raise an issue in their "Statement of Issues" regarding the application of qualified immunity to their negligence per se theory. Therefore, even if

the negligence per se claims were not abated upon the death of General Helper, we would affirm the trial court's dismissal of them.[4]

**CONCLUSION**

In light of the foregoing discussion, we hold that the case should be remanded for the entry of an order of abatement with respect to the Plaintiffs' claims for tortious interference with a business relationship and prospective business relationships. Having assumed in this appeal, arguendo, that the Plaintiffs' claims under a negligence per se theory were not "for wrongs affecting the character of the plaintiff" and therefore did not abate, we have held that the dismissal of those claims should be affirmed based on the Plaintiffs' failure to properly challenge, through their briefing, one of the independent bases for dismissal of the negligence per se claims. All other issues not specifically addressed herein are pretermitted, and the case is remanded for such further proceedings as are necessary and consistent with this Opinion.

s/ Arnold B. Goldin<br>
ARNOLD B. GOLDIN, JUDGE

---

[4] It matters not that the Plaintiffs' first issue, challenging the trial court's finding of absolute immunity, broadly deals with their "state-law tort claims" generally, which is, of course, in contrast to the Plaintiffs' specific focus in their second issue on "claims of tortious interference." The failure to properly challenge *all* bases for dismissal, which is evident through the presentation of the Plaintiffs' second issue, leads this Court to affirm the trial court's disposition regarding the negligence per se count. *See Ramos v. Caldwell*, No. M2022-00222-COA-R3-CV, 2023 WL 1776243, at \*4 (Tenn. Ct. App. Feb. 6, 2023) (affirming judgment in light of the appellant's failure to challenge an independent alternative ground supporting the trial court's decision).

Although we might speculate that the Plaintiffs' third raised issue, which submits there are "disputed material facts," is perhaps, in part, intended to challenge the foundation upon which the trial court determined qualified immunity to exist in relation to the negligence per se theory of recovery, we can do no more than that. Indeed, we agree with the Appellee that the third issue raised by the Plaintiffs is itself waived due to insufficient briefing in the argument section. The argument section for this issue simply references certain facts the Plaintiffs assert were disputed, but the argument does not otherwise actually discuss these facts or explain why they are material. In relation to this latter point, the argument does not even point to which of the substantive claims, or legal issues that the trial court resolved, that these facts supposedly have significance. In effect, we are ultimately left to speculate and construct and piece together an argument on our own. This, of course, is not something that we are required to do. *See Chiozza v. Chiozza*, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009) (noting that it is not the function of this Court to construct a party's argument).

The negligence per se theory ultimately appears to be somewhat of an afterthought in the Plaintiffs' submitted briefing. In addition to what we have already noted with respect to the Plaintiffs' cabining of their second issue to their "claims of tortious interference," not only was the negligence per se theory not directly mentioned anywhere in the argument section of the Plaintiffs' principal brief, the Plaintiffs' response to the Appellee's contention about abatement, which appeared in the Plaintiffs' reply brief, argued singularly with respect to their tortious interference claims.