NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0559n.06
Case No. 24-2098

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| DOMINIQUE RAMSEY; TRAVIS SAMMONS, | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| DAVID RIVARD, et al., | ) | |
| Defendants, | ) | |
| | ) | |
| MARK J. GAERTNER, | ) | OPINION |
| Defendant-Appellee. | ) | |

**FILED**
Dec 04, 2025
KELLY L. STEPHENS, Clerk

Before: MOORE, COLE, and MATHIS, Circuit Judges.

COLE, Circuit Judge. Dominique Ramsey and Travis Sammons were convicted of conspiracy to commit murder based largely on a show-up identification. After Ramsey and Sammons had been incarcerated for more than five years, Michigan appellate courts vacated their convictions and prosecutors dismissed the case. Ramsey and Sammons subsequently sued Saginaw County and several individuals involved in their prosecution, including Saginaw County Chief Assistant Prosecutor Mark J. Gaertner. The district court granted summary judgment as to Gaertner based on absolute and qualified immunity. For the following reasons, we affirm the grant of absolute immunity to Gaertner with respect to the malicious prosecution claim, reverse the grant of qualified immunity to Gaertner as to the due process claim, and remand for further proceedings consistent with this opinion.

I.

We detailed the factual background to this appeal in a related case. *See Ramsey v. Rivard*, 110 F.4th 860, 863–65 (6th Cir. 2024) ("*Ramsey I*"). To summarize, on June 21, 2015, Humberto Casas Jr. was shot and killed in Saginaw, Michigan. Felicia Little and her sixteen-year-old son, DyJuan Jones, witnessed the shooting. According to Jones, a bald Black man wearing a white shirt and black pants fired several shots at Casas. The gunman fled the scene in a light grey Jeep driven by a second Black man with a long beard, wearing a white shirt, and appearing to weigh between 280 and 320 pounds.

About ten to twenty minutes after the shooting, police officers pulled over a silver Jeep driven by two Black men in white shirts: Ramsey and Sammons. Both men were taken to the Saginaw Police Department and detained as possible suspects, even though neither matched much of the physical description of the assailants closely. Little and Jones separately went to the police station for follow-up interviews. With both the witnesses and suspects present at the police station, detectives considered organizing a single-suspect show-up identification.

Before conducting the show-up, David Rivard, a Michigan State Police sergeant, called Gaertner to discuss the plan. He explained to Gaertner that a show-up identification was the "most reasonable" of the possible identification procedures, because officers "didn't want to let [Ramsey and Sammons] go to do a photo lineup" and because they lacked the "resources" to "get five other individuals" together for a corporeal line-up. (Rivard Dep., R. 72-14, PageID 3050.) Gaertner advised Rivard that the identification procedure should not be "overly suggestive," and asked Rivard whether Ramsey and Sammons would appear to the witnesses as suspects, for example, if they were handcuffed or in jail clothes. (Gaertner Dep., R. 72-15, PageID 3101, 3108; Rivard Dep., R. 72-14, PageID 3050.) Rivard responded there was "no indication that they were under

arrest for anything" and explained he intended to have Jones and Little look inside the interview rooms where Ramsey and Sammons were sitting and ask only if and how they recognized them "so that there would be no suggestion of whether [Ramsey and Sammons were] involved." (Rivard Dep., R. 72-14, PageID 3050.) Gaertner approved of Rivard's plan, and Rivard proceeded.

After the identification procedure, Rivard reported that Jones did not recognize Ramsey but identified Sammons as the shooter. During the preliminary examination and at trial, however, Jones testified that he never identified or recognized Sammons.

On January 27, 2016, a jury convicted Ramsey and Sammons of conspiracy to commit murder but acquitted them of all other charges. The trial judge granted Ramsey's subsequent motion for a directed verdict and vacated his conviction, though the state successfully appealed. Sammons appealed his conviction and sentence, and the Michigan Supreme Court ultimately vacated his conviction and remanded for a new trial, finding the identification procedure to be unduly suggestive and unreliable. *People v. Sammons*, 949 N.W.2d 36, 40 (Mich. 2020). Ramsey's case was later remanded based on the same error. The prosecutor subsequently filed a motion for nolle prosequi based on insufficient evidence to secure a conviction, and Ramsey and Sammons were released on October 30, 2020, after spending more than five years in custody.

Ramsey and Sammons sued Rivard, his supervisor, and Gaertner in their individual capacities, and they sued Saginaw County. This appeal concerns only the claims against Gaertner. Rivard and Sammons alleged Gaertner violated their due process rights under the Fourteenth Amendment and fair trial rights under the Sixth Amendment by approving and authorizing the identification procedure. They also brought a malicious prosecution claim, alleging that Gaertner utilized "deliberately and knowingly fabricated evidence in connection" with the purported identification of Sammons during the prosecution. (Fourth Am. Compl, R. 49, PageID 321.)

The parties cross-moved for summary judgment, with Gaertner claiming qualified immunity for his investigatory conduct and absolute immunity for his prosecutorial conduct. The district court granted Gaertner's motion for summary judgment, concluding that qualified immunity barred plaintiffs' due process claim and absolute immunity barred plaintiffs' malicious prosecution claim. After the district court issued a final order dismissing the case, plaintiffs timely appealed.

II.

We review a district court's grant of summary judgment on absolute or qualified immunity grounds de novo. *See Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011). Summary judgment is proper if, viewing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Reform Am. v. City of Detroit*, 37 F.4th 1138, 1147 (6th Cir. 2022). In cases involving cross-motions for summary judgment, as here, this standard of review remains the same, requiring us to "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (citation omitted).

III.

Prosecutors are entitled to absolute immunity insofar as their conduct is "intimately associated with the judicial phase of the criminal process, such as when the prosecutor initiates a prosecution and presents the State's case." *Smith v. Wayne County*, 147 F.4th 613, 619 (6th Cir. 2025) (citation modified). We employ a "functional approach" to determine whether the prosecutor's conduct was tied to the judicial process, inquiring into "the nature of the function performed, not the identity of the actor who performed it." *Watkins v. Healy*, 986 F.3d 648, 661

(6th Cir. 2021) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). When prosecutors act as advocates for the State, they receive absolute immunity. *Id.*

But when prosecutors perform the "investigative functions normally performed by a detective or police officers," *Smith*, 147 F.4th at 620 (quoting *Buckley*, 509 U.S. at 273), or give legal advice to the police, *Burns v. Reed*, 500 U.S. 478, 494–96 (1991), they receive only qualified immunity. "Therefore, we must identify precisely the wrongful acts that a prosecutor has taken and classify those acts according to their function." *Jackson v. City of Cleveland*, 64 F.4th 736, 743 (6th Cir. 2023) (citation modified).

Ramsey and Sammons's arguments concern Gaertner's conduct at two points: (A) a phone call between him and Rivard, where he advised or approved of Rivard's use of an improper identification procedure and (B) the initiation of proceedings, including handling a preliminary examination during a probable cause hearing. Gaertner's conduct during the former serves as the basis for Ramsey and Sammons's due process claim, from which he claims qualified immunity, and his conduct during the latter serves as the basis for their malicious prosecution claim, from which he claims absolute immunity. We consider each in turn.

A.

Gaertner rightly does not argue that he is entitled to absolute immunity for his conduct related to the phone call. The call occurred before Ramsey or Sammons were indicted and before officers established probable cause and, therefore, before Gaertner's role as an advocate had begun. *See Jackson*, 64 F.4th at 743–44; *see also Watkins*, 986 F.3d at 663 ("[A] prosecutor acts only as an investigator and not an advocate *before* probable cause surfaces[.]"). Moreover, it is well established that absolute prosecutorial immunity does not extend to giving legal advice to the police. *See Burns*, 500 U.S. at 496; *see also Stockdale v. Helper*, 979 F.3d 498, 502 (6th Cir.

2020). So Gaertner is indeed at most entitled to qualified immunity for his advice to Rivard. *See Watkins*, 986 F.3d at 666.

Like other government officials, a prosecutor is entitled to qualified immunity unless a reasonable jury would find that (1) the prosecutor's conduct violated the plaintiff's constitutional or statutory right, and (2) that right was clearly established at the time of the challenged conduct. *See Raimey v. City of Niles*, 77 F.4th 441, 447–48 (6th Cir. 2023). We exercise our discretion in deciding which of the two prongs to address first. *Id.* at 448.

To begin, Ramsey and Sammons properly identify a known constitutional right: the right to be free from the use of an unduly suggestive identification. Since as early as 1967, it has been clearly established that "[c]riminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Gregory v. City of Louisville*, 444 F.3d 725, 746 (6th Cir. 2006) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)); *see also Gillispie v. Miami Township*, 18 F.4th 909, 918 n.2 (6th Cir. 2021). Although a show-up identification procedure is not per se constitutionally impermissible, the Supreme Court has cautioned that the procedure is "widely condemned" and found it permissible only when considering whether the totality of the circumstances and exigencies demanded it. *Stovall*, 388 U.S. at 302; *see also Salter v. City of Detroit*, 133 F.4th 527, 540 (6th Cir. 2025), petition for cert. filed, No. 25-378 (Sept. 26, 2025).

We therefore must consider whether Gaertner violated this right. Gaertner contends that because the show-up resulted in no actual identification, it thus did not violate plaintiffs' constitutional rights.

- 6 -

We disagree with Gaertner, as his reasoning cannot be squared with our prior analysis in *Ramsey I*. There, we held that a jury could find this very same show-up unduly suggestive and unnecessary, and "the resulting identification" unreliable under clearly established law. *Ramsey I*, 110 F.4th at 868–69. We also recognized that Rivard could be found to have caused the constitutional harm by arranging the show-up identification. *Id*. at 869; *see also Gregory*, 444 F.3d at 746.

Here, as in *Ramsey I*, there is a genuine dispute of material fact as to whether the show-up yielded an unconstitutional identification later introduced at trial. Plaintiffs maintain that Rivard's report reflected an identification emerging from the show-up procedure, even if they have also argued that Rivard later falsified aspects of that report. *See* Appellant Br. 30 ("The evidence . . . establishes that Gaertner specifically discussed and agreed to the use of the constitutionally deficient identification procedure that was then implemented by Rivard. Gaertner therefore provided advice that was improper and constitutionally prohibited.") As such, at this stage, we cannot resolve that factual dispute in Gaertner's favor.

The proper inquiry is not whether plaintiffs' fabrication allegations negate the possibility that the show-up produced an identification, but whether a jury could find that Gaertner's approval and authorization of the show-up contributed to the constitutional harm ultimately suffered: "the use of the impermissible identification leading to [plaintiffs'] criminal conviction." *Ramsey I*, 110 F.4th at 869. As we observed with respect to Rivard, a jury could conclude that Gaertner's involvement in advising and approving the show-up resulted in constitutional harm. *Id*.; *see also Sammons*, 949 N.W.2d at 51–53. And a jury may hold Gaertner "responsible for the natural consequences of his actions," which includes convictions obtained through introduction of the

purported identification he authorized. *Gregory*, 444 F.3d at 747 (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)).

Thus, we cannot conclude that Gaertner's conduct was constitutionally harmless merely because plaintiffs also allege fabrication. That argument would imply that Rivard, too, was entitled to qualified immunity, which is an outcome *Ramsey I* squarely rejects. Because a reasonable jury could find that Gaertner's advice and approval of the show-up contributed to the unconstitutional identification used at trial, Gaertner is not entitled to qualified immunity at this stage. *See Ramsey I*, 110 F.4th at 869.

B.

We turn next to Gaertner's conduct during the initiation of proceedings, for which he claims absolute immunity. "Because we grant absolute immunity only sparingly, officials seeking its ironclad protection bear the burden of showing that qualified immunity does not suffice." *Stockdale*, 979 F.3d at 502 (citation modified). As noted earlier, "the critical question is whether [Gaertner] was functioning in an enforcement role and acting as an advocate for the state in initiating and prosecuting judicial proceedings." *Cooperrider v. Woods*, 127 F.4th 1019, 1029 (6th Cir. 2025) (quoting *Cooper v. Parrish*, 203 F.3d 937, 947 (6th Cir. 2000)).

Gaertner did not appear for the State during the trial, but he recommended an arrest warrant and elicited testimony regarding the false identification during a preliminary probable cause hearing. Ramsey and Sammons argue we should construe this conduct as a byproduct of Gaertner's legal advice to Rivard, since "the illegal show-up procedure that Gaertner authorized and approved influenced both the initiation of charges against plaintiffs and plaintiffs' continued detention." (Appellant Br. 33.)

Our precedent, however, requires us to look at the specific "'wrongful acts' that a prosecutor has taken" when determining whether absolute immunity applies, not the downstream effects of those acts. *Jackson*, 64 F.4th at 743 (citation omitted). And here, the acts Gaertner took—participating in a probable cause hearing and supporting an arrest warrant—were part of his duties as an advocate for the State. *See Burns*, 500 U.S. at 486–87. "Prosecutorial decisions regarding witness testimony, including what witnesses to use at [a hearing], and what questions to ask them," are also activities "protected by absolute prosecutorial immunity." *Spurlock v. Thompson,* 330 F.3d 791, 798 (6th Cir. 2003). This is true even when a prosecutor knowingly elicits false testimony. *Id.*; *see also Price v. Montgomery County*, 72 F.4th 711, 719 (6th Cir. 2023) (noting that "prosecutorial immunity has a long reach" and extends to "instances where a defendant is genuinely wronged").

In any case, based on plaintiffs' own version of events, Gaertner's "authorization and approval of the constitutionally defective show-up process" did not truly "dr[i]ve forward the criminal case." (Appellant Br. 36.) As discussed above, the show-up did not yield an identification. It was Rivard's falsification of the identification that created the probable cause for prosecution.

Gaertner, therefore, has absolute immunity for his conduct during the prosecution. Since Ramsey and Sammons's malicious prosecution claim against Gaertner concern his conduct during the initiation of the State's case, Gaertner is entitled to absolute immunity from that claim.

IV.

For the foregoing reasons, we affirm the grant of absolute immunity on plaintiffs' malicious prosecution claim against Gaertner, reverse the grant of qualified immunity on plaintiffs'

due process claim against Gaertner, and remand the case for further proceedings consistent with this opinion.